Grover VIGIL and Charlene Vigil as General Guardians and Next Friends for Ashley Vigil, a Minor Person, and Kee Sandoval and Judy Sandoval as General Guardians and Next Friends for Kristofferson Sandoval, a Minor Person, and Angela C. Allen, as General Guardian and Next Friend for Angelo Allen, a Minor Person, Individually and on Behalf of All Other Persons Similarly Situated, Plaintiffs,

v.

Everett R. RHOADES, M.D., Director of the Indian Health Service, His Agents, Employees, and Successors, Otis R. Bowen, Secretary of the Department of Health and Human Services, His Agents, Employees, and Successors, the Department of Health and Human Services, Donald O. Hodel, Secretary of the Department of the Interior, His Agents, Employees, and Successors, Ross Swimmer, Assistant Secretary of the Interior--Indian Affairs, Bureau of Indian Affairs, United States Department of the Interior, His Agents, Employees, and Successors, the Department of the Interior, and the United States of America, Defendants.

Civ. No. 86–1182–JB.

United States District Court,
D. New Mexico.

July 6, 1990.

Supplemental Opinion Aug. 28, 1990.

Joel R. Jasperse, Helen Avalos, Gallup, N.M., for plaintiffs.

William L. Lutz, U.S. Atty., Ron F. Ross, Raymond Hamilton, Asst. U.S. Attys., Albuquerque, N.M., for defendants.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER is before the Court on the Motion for Partial Summary Judgment filed December 30, 1987 by Plaintiffs, the Motion to Dismiss and in the Alternative for Summary Judgment Based on Lack of Jurisdiction filed December 30, 1987 by "federal" defendants and joined and supplemented February 3, 1988 by "interior" defendants, all responses thereto, and all replies to the responses. Having reviewed the pleadings, the evidence of record and the relevant law, the Court finds that Defendants' motions are not well taken and will be denied, and that Plaintiffs' motion is well taken and will be granted with relief limited to that set forth herein.

Over the extended history of this litigation, virtually no operative fact has escaped dispute by the parties. The Court's careful scrutiny of the record places at least this much beyond controversy: Using funds appropriated pursuant to the Snyder Act [1], 25

---

1. Denying that the Snyder Act was the sole funding authority, Plaintiff adverts as well to the Indian Health Care Improvement Act, 25 U.S.C. § 1601–1680j (1982, Supp. II 1984, and Supp. III 1985) ["IHCIA"] (also referenced by parties as Pub.L. 94–437), and to the Education for All Handicapped Children Act, 20 U.S.C. §§ 1400 *et seq.* (1982, Supp. I 1983, Supp. II 1984, Supp. III 1985) ["EAHCA"] (also referenced by parties as Pub.L. 94–142).

U.S.C. § 13, the Bureau of Indian Affairs ["BIA"] and the Indian Health Service ["IHS"] jointly established and, for a time, operated, the Indian Children's Program ["Program"]. This was an undertaking that directly provided a variety of health care support services to certain handicapped Indian children. The array of services included identification and diagnosis of the children and their handicaps, development and monitoring of treatment plans, "consultative visits" in children's home communities, training, and some clinical services such as physical therapy. Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 1–3; Memorandum in Support of Defendants' Motion to Dismiss at 15–18. The Program was in place at least in preliminary form as early as 1979. *See, e.g.,* Memorandum in Support of Defendants' Motion to Dismiss, Exhibit "G" [Hearings Before the House Subcommittee on Appropriations, Department of the Interior and Related Agencies Appropriations for 1980, 96th Cong., 1st Sess., pt. 8, at 245–52]. The evolving contours and exact details of the Program and its manner of operation are intricate and will be discussed only as relevant to the Court's individual rulings *infra.*

Over a period of several months beginning in July 1985, the Program was terminated,[2] apparently at the immediate instance of IHS officials Kreuzberg and Vanderwagen. The termination was effected in a manner that Defendants concede did not comport with the requirements of the Administrative Procedure Act ["APA"], *see* Memorandum in Support of Defendants' Motion to Dismiss at 46, the applicability of which is one of the questions now before the Court. As of the termination of direct Program services in 1985, it was "currently following" some 426 children. Deposition of Sanchez at 44–46. According to Defendants, the decision to terminate the Program involved "redirecting staff efforts

into a national data gathering and technical assistance role for the benefit of all IHS Areas and Service Units throughout the country." Memorandum in Support of Defendants' Motion to Dismiss at 2.

Plaintiffs thereafter commenced this action for declaratory and injunctive relief against the United States; the Department of the Interior, of which the Bureau of Indian Affairs is an agent; the Department of Health and Human Services, of which the Indian Health Service is an agent; and various officials of these entities. In particular, Plaintiffs seek a judicial declaration that the termination violated the federal trust responsibility to Indians, the Administrative Procedure Act, the Fifth Amendment, the Snyder Act, the Indian Health Care Improvement Act, and various other "rules and regulations;" and that the termination was arbitrary and capricious, an abuse of agency discretion, and contrary to law. Plaintiffs accordingly request an injunction compelling Defendants to provide essential health care support services to Plaintiffs and compelling Defendants to withdraw their termination of the Program. Plaintiffs also request "mandamus relief" compelling Defendants to: 1) undertake public notice and comment procedures before again terminating the Program; 2) implement a system to ensure optimum health for handicapped Indian children at service units in the Southwest; and 3) "develop and implement a national level policy with respect to their obligation to provide health and medical services to handicapped Indian children." Plaintiffs are a stipulated class consisting of:

all handicapped Indian children who in the past received, or who presently are, have been, or will be eligible to receive health services from the Indian Health Service in the Albuquerque area, Navajo area, and Hopi reservation portion of the Phoenix area, including health services

2. *See* Memorandum in Support of Defendants' Motion to Dismiss at 23–24, Exhibit "S" [July 1985 Memorandum from Pierce and Makowski], Exhibit "T" [August 1985 Memorandum from Pierce and Makowski]. While not denying that the Program was "terminated" as such, Defendants characterize the action at issue as "a decision made by the Indian Health Service

(IHS) to discontinue consultative patient services provided by the IHS component of what was the Indian Children's Program, a joint pilot project in the southwest co-administered by the IHS and the Bureau of Indian Affairs (BIA)." Memorandum in Support of Defendants' Motion to Dismiss at 1.

formerly available through the Indian Children's Program.

*Vigil v. Rhoades*, Civil No. 86–1182–JB, Order [certifying class pursuant to Fed.R. Civ.P. 23(b)] (D.N.M. June 22, 1987).

Plaintiffs develop two theories in their bid to have the Court set aside the termination of the Program under the judicial review powers afforded by the Administrative Procedure Act ["APA"]. They are, broadly: 1) that the termination violated the federal government's trust duty to Indians as expressed generally and in a number of statutory schemes, particularly the Snyder Act, the Education for All Handicapped Children Act, and the Indian Health Care Improvement Act; and, 2) that the manner of the termination violated the "notice and comment" provisions of the APA. Plaintiffs also claim that the termination violated their Fifth Amendment right to due process.[3] Plaintiffs move for summary judgment as to certain of their requests for relief and on all but their constitutional claims.[4] Defendants move for dismissal, arguing that Plaintiffs lack standing; that Plaintiffs fail to state a claim for relief because they lack specific substantive entitlement to Program services and hence assert no deprivation of any legally protected right; and that Plaintiffs are not entitled to the judicial review they seek. Alternatively, Defendants seek summary judgment upholding the termination as having a rational basis and as not being contrary to law, 5 U.S.C. § 706(2)(A), and determining that Plaintiffs' constitutional claims must fail for lack of any legitimate claim of entitlement to the services or procedure Plaintiffs seek.

The parties have framed substantial questions respecting Plaintiffs' standing to sue and the availability of judicial review of the administrative action terminating the Program. The Court resolves the standing issues in Part I of this Opinion and the reviewability issues in Part II. In Part III, the Court proceeds to the determination whether the termination of the Program violated the Administrative Procedure Act.

## I.

Of threshold significance are the Interior Defendants' tardily advanced arguments that the Plaintiff class is without standing to sue them. The arguments of these Defendants implicitly fuse the standing inquiry with the assessment of legal sufficiency of a claim under Federal Rule of Civil Procedure 12(b)(6). They must therefore be assessed with respect to both standards.

■ In general, "question[s] of standing in federal courts [are] to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.'" *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In assessing questions of standing to bring suit challenging administrative action, the applicable analysis is twofold. The first inquiry is whether Plaintiffs have alleged that the challenged action has caused them "injury in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829. Then, the Court must determine whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830.

■ In contrast, a motion to dismiss under Rule 12(b)(6) focuses on the legal cognizability of a claim of injury. When considering a motion to dismiss, the material allegations of the Complaint must be accepted as true. *Franklin v. Meredith*, 386

---

**3.** In addition, The Complaint and Plaintiffs' moving papers disclose an ill-developed attempt to proceed *directly* under the doctrine of federal trust responsibility to Indians. Given its rulings, *infra*, the Court need not address the viability of such an approach.

**4.** Specifically, Plaintiffs "move the Court for a partial summary judgment declaring ... that Defendants owe a special trust duty to Plaintiffs;

... that Defendants have violated their special trust obligations to Plaintiffs by terminating the ICP [and by doing so] without providing Plaintiffs with notice and an opportunity to be heard; [and] that Defendants have violated the publication and rule-making requirements of the Administrative Procedure Act, 5 U.S.C. §§ 552, 553 (1982, Supp. III 1985)." Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at 4.

F.2d 958, 959 (10th Cir.1967). The complaint is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (emphasis added). The Court shall construe the pleadings liberally, and if there is any possibility of relief the case should not be dismissed. *Gas-a-Car, Inc. v. American Petrofina, Inc.* 484 F.2d 1102, 1107 (10th Cir.1973).

■ One of Interior Defendants' contentions is, in essence, that they never undertook to provide services to the entire Plaintiff class and hence did not injure it "in fact" when the Program was terminated. The Interior Defendants contend alternatively that they were under no legal duty to provide services to the entire Plaintiff class and hence inflicted no legally actionable harm when the Program was terminated. In support, these Defendants note that the only eligible beneficiaries of BIA health support services would be those handicapped Indian children who "attend BIA enrolled schools." *See* 25 C.F.R. 45.1. Thus, Interior Defendants contend, because there are members of the stipulated class who do not "attend BIA enrolled schools," *see* Interior Defendants' Supplemental Memorandum in Support of Defendants' Motion to Dismiss at 7, Plaintiffs' classwide claim for services against the BIA is without legal basis. Moreover, they reason, because the BIA alone could not have *lawfully* served the entire Plaintiff class, BIA sponsorship of the Program does not justify the inference that the BIA did undertake to serve the entire class. Interior Defendants further contend that those class members who do attend BIA schools now receive all the health care and support services to which they are entitled through another BIA program called ISET funded pursuant to Pub.L. 94–142[5] or, for pre-

school Indian children ages 3–5 on reservations, through yet another BIA program. According to Interior Defendants, those who instead attend public schools receive all the services they are due from the public school systems in which they are enrolled, also pursuant to Pub.L. 94–142. Interior Defendants thereupon conclude that no member of Plaintiff class has suffered or complains of any actionable injury at their hands.

This threshold attack on Plaintiffs' claims is grounded on a misconception of what the term "joint" means in the context of the participation of the BIA and IHS in the terminated venture. As Interior Defendants' position would have it, notwithstanding that both entities are conceded to have simultaneously sponsored the Program, each was implicitly tendering itself as "providing for" only that subset of the serviced children fitting within the literal meaning of that entity's governing statutes and regulations. Thus, the inchoate argument proceeds, because the reach of the specific statutory and regulatory provisions governing either of the two agencies alone is not so inclusive as to encompass the entirety of Plaintiff class, neither agency can properly be subject to any one of Plaintiffs' *classwide* claim against it.

This result flows from a view of the controversy that is artificial and logically awkward, and more importantly, insufficiently substantiated. Indeed, Plaintiffs' allegations and the essentially uncontested evidence in the record are to the effect that the participation of the two agencies was truly joint and was never represented otherwise—was, as a practical matter, administratively unitary, predicated on a relationship in which each agency was acting as agent for the other, and providing services in a combination and manner that neither agency alone could have offered.[6] Regard-

---

5. *See supra* note 1.

6. *See, e.g.,* Memorandum in Support of Defendants' Motion to Dismiss at 14, Exhibit "K" [1980 Report on Project Activity], Exhibit "L" [1980 Memorandum Agreement]; *see also* Memorandum in Support of Defendants' Motion to Dismiss at 16 ("The ICP service population included not only BIA school children for whom BIA had Pub.L. 94–142 responsibilities, but also

any Indian child from birth to age 21 eligible for IHS services and suspected of having a handicapping condition"); Memorandum in Support of Defendants' Motion to Dismiss at 7–9, Exhibit "B" [January 1978 Johnson Letter], Exhibit "C" [November 1977 Johnson Letter]. In characterizing the Program as a "joint pilot study project," Memorandum in Support of Defendants' Motion to Dismiss at 15, Defendants

less of what Defendants claim to be the scope of their *statutory* mandate, they do not deny that the Program was a jointly sponsored enterprise that in fact delivered services to Plaintiff class members not actually enrolled in BIA schools, *see, e.g.,* Memorandum in Support of Defendants' Motion for Summary Judgment at 16, and that the Program has now been terminated, *see* Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Exhibit 5 at 38; *see also* Memorandum in Support of Defendants' Motion to Dismiss at 3 ("The ICP pilot project no longer exists.") *Cf. Morton v. Ruiz,* 415 U.S. 199, 212, 94 S.Ct. 1055, 1063, 39 L.Ed.2d 270 (1974) (relying on BIA's past practice as potential constraint on its future action, notwithstanding apparently permissive mandate of Snyder Act). In all, the Court finds unavailing Defendants' sponsorship-based attacks on Plaintiffs' standing and on the legal sufficiency of their claims.

■ Defendants' attack alternatively seeks to demonstrate failure of the "injury in fact" component of standing by alleging that Plaintiffs continue to receive health support services, albeit through different programs. Again, however, the only reasonable inference from the record evidence supporting Plaintiffs' essentially unrebutted allegations is that since termination of the Program, class members have not been offered or have not been able to avail themselves of an array of assertedly essential health care services as extensive as that which the Program had provided. *See, e.g.,* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 5, 8, 11, Exhibit 2 [Affidavit of Julia Sells, P.T.]; Attachment 1 to Declaration of Margaret A. Wilson, R.P.T., at 2.

As applied to the case at bar, the final phase of the standing analysis stirs no real controversy. Plaintiffs' claimed injury is "arguably within the zone of interests"

sought to be protected by the body of law Plaintiffs invoke. *Association of Data Processing Service Organizations,* 397 U.S. at 153, 90 S.Ct. at 830. Plaintiffs assert adverse effects upon their physical health as the result of Defendants' actions, and they do so with reference to an imposing body of law encompassing the Snyder Act, the statutory foundation for the Indian Health Service, and cases establishing the government's special duty of diligence as trustee in implementing these and other more particularized laws respecting the welfare of Indians. Plaintiffs, as Indians, are precisely the intended beneficiaries of this body of law.

Defendants inappropriately insist that Plaintiffs invoke an overt and textually precise statutory basis for each of their specific claimed entitlements to services, *see, e.g.,* Interior Defendants' Reply to Plaintiffs' Response at 3. In so doing, they essentially import *legal* sufficiency arguments into the assessment of standing, breeding confusion. Even more fundamentally, they commit themselves to a narrow, grudging view of the federal trust duty that departs significantly from the notion of that duty as evolved in the courts. In particular, such cases as *Vigil v. Andrus,* 667 F.2d 931 (10th Cir.1982) make clear that an agency as trustee cannot summarily discontinue support services it has undertaken to provide to Indians and thereafter assert as justification that these services were, in a legal sense, gratuitous.

Furthermore, the Court finds that dismissal as to the BIA would be improvident. In retaining the BIA as party, the Court ensures that any decree that may be ultimately entered "is not thwarted by the omission of a[n] ... agency that might by inaction hamper the carrying out of its provisions."[7] *Parks v. Pavkovic,* 753 F.2d 1397 (7th Cir.1985). In all, the Court finds no deficiency in Plaintiffs' showing of their

---

further undercut their adherence to the view that the Program had a "BIA component" somehow functionally isolable from the "IHS component."

7. Indeed, the legislative history of the IHCIA clearly demonstrates that Congress had *contemplated* "a major cooperative care agreement between the IHS and the BIA." H.R.Rep. No.

1026, 94th Cong., 2d Sess., Pt. 1 at 80–81, *reprinted in* 1976 U.S.Code Cong. and Admin. News 2652, 2718–19; *see also id.* at 94–95, 1976 U.S.Code Cong. and Admin.News 2732, 2733. As discussed *infra,* however, the Court today need not decide whether Congress, by this or any other expression, ultimately "ratified" the ICP as actually implemented.

standing to challenge the administrative action here at issue. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

By parity of reasoning Defendants' arguments are equally ineffectual at showing that Plaintiffs fail to state a claim for relief. As in Defendants' argument as to standing, the object is apparently to establish that Defendants owe Plaintiffs no legal duty of the sort Plaintiffs are seeking to enforce. As already indicated, Plaintiffs assert that they suffered harm resulting from a reviewable agency rulemaking action—from the substance of that action and the manner in which it was taken. The Court finds no legally essential element missing in Plaintiffs' claim seeking judicial review of Defendant agencies' actions as having violated their statutory duties to Plaintiffs, as having been taken in violation of APA procedural requirements, and as having deprived Plaintiffs of their due process rights protected by the Fifth Amendment.

## II.

Equally untenable is Defendants' contention, upon which they seek dismissal, that judicial review of the action terminating the Program is not available to Plaintiffs. Plaintiffs are entitled to judicial review of the termination unless that action is within the "very narrow exception" for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *see also Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Except under certain circumstances not present here, *see, e.g., Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (where issue is agency's refusal to take enforcement action, "the presumption is that judicial review is not avail-

able"), there is a presumption *in favor of* judicial review, and the exception for "agency discretion" is to be construed narrowly. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Supreme Court has recently acknowledged that the presumption of reviewability has deep roots in some of that Court's earliest pronouncements on the role of the judiciary. *Bowen*, 476 U.S. at 670, 106 S.Ct. at 2135 (quoting *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 163, 2 L.Ed. 60 (1803) ("[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws.")). Accordingly, the burden of proving nonreviewability falls heavily upon the party asserting it. *Sierra Club v. Hodel*, 848 F.2d 1068, 1075 (10th Cir.1988). The narrow exception in § 701(a)(2) precludes judicial review only when the law delineating the agency's authority is so vague or generalized that, as a practical matter, there is "no law to apply" by the reviewing Court in assessing the propriety of the agency's specific action. *See Citizens to Preserve Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820.

■ The Court concludes that the exception for actions "within agency discretion" does not apply here. Plaintiffs are correct that there is ample "law to apply" to actions of these agencies, including the Snyder Act, the EAHCA, the IHCIA, cases setting the contours of the federal government's trust duty to Indians, and significantly, evidence suggesting that Congress had learned of the existence of the Program and cognized that fact in fashioning its Indian-related appropriations in succeeding fiscal years.[8] *See Andrus*, 667 F.2d at 934–35. While the statutes are general, they are nonetheless fully explicit enough to enable a reviewing court to determine

---

8. *See, e.g.,* Memorandum in Support of Defendants' Motion to Dismiss, Exhibit "G" [Hearings Before the House Subcommittee on Appropriations, Department of the Interior and Related Agencies Appropriations for 1980, 96th Cong., 1st Sess., Pt. 8 at 245–52] (Members responding favorably during briefing on ICP, reported as already being partly implemented). Further, as

Defendants concede, "Congress did add $300,000 to the IHS appropriation for fiscal year 1980 to expand the ICP into a nationwide effort under a cooperative agreement with the BIA." Memorandum in Support of Defendants' Motion to Dismiss at 12 (discussing H.R.Rep. No. 374, 96th Cong., 1st Sess., at 82–83).

whether the agencies they bind are "ignor[ing] clear jurisdictional, regulatory, statutory, or constitutional commands." *Heckler v. Chaney,* 470 U.S. at 839, 105 S.Ct. at 1660 (Brennan, J., concurring).

For example, even the broadest of these statutes, the Snyder Act, imports some intelligible standard against which to measure agency conduct. That Act provides that "the Bureau of Indian Affairs ... shall direct, supervise, and expend such moneys as Congress may ... appropriate, for the benefit, care, and assistance of the Indians ... for relief of distress and conservation of health." 25 U.S.C. § 13. These statutory parameters suffice to ensure that the Court, asked to review a given agency action, is presented with a palpable question: whether the action ultimately does redound to the "benefit, care and assistance" of Indians. In particular, the reviewing Court would be called upon to consider whether the action ultimately does work the "relief of distress and conservation of health" or whether, on the other hand, it defeats congressional purposes or flouts the legislative mandate. *See Robbins v. Reagan,* 780 F.2d 37, 45–46 (D.C.Cir.1985). A statutory command of this breadth confers broad discretion upon the agency to apply its peculiar expertise in determining *how* to achieve its mandated objective and in optimally allocating scarce resources to this end, but the breadth of

the command does not imply discretion to act in a manner that ignores or disserves the objective. *Id.; see Heckler,* 470 U.S. at 839, 105 S.Ct. at 1659 (Brennan, J., concurring); *see also Farmworker Justice Fund, Inc. v. Brock,* 811 F.2d 613, 620–23 (D.C. Cir.1987), *vacated as moot,* 817 F.2d 890 (D.C.Cir.1987) (suggesting also that a finding that the agency action was not "committed to agency discretion"—and is therefore reviewable on the merits—is not prerequisite to reviewability for "lawlessness"). Indeed, the narrowness of the "no law to apply" exception is such that actions taken pursuant to some remarkably broad statutory mandates have been pronounced "reviewable." *See, e.g., Sierra Club v. Hodel,* 848 F.2d 1068 (10th Cir.1988) ("A court can measure whether the improvement of [a local road] will 'impair the suitability of [Wilderness Study Areas] for preservation as wilderness' or will cause 'unnecessary or undue degradation.' "); *Moapa Band of Paiute Indians v. United States Department of Interior,* 747 F.2d 563 (9th Cir.1984).

Moreover, Defendants' narrow view of what may be considered "law to apply"[9] is not the prevailing one. "Law to apply" is a protean concept and, at least with respect to the threshold determination of reviewability, has been acknowledged to encompass far more than simply the organic act creating the agency.[10]

---

9. Although, in arguing the question of reviewability, Defendants insist that only the relatively generalized Snyder Act might constitute "law to apply," in a different context they implicitly concede otherwise: "The IHS action has a rational basis and does not violate *the Snyder Act or IHCIA, the Federal trust responsibility to Indians, the Administrative Procedure Act, or plaintiffs' constitutional rights to due process.*" Memorandum in Support of Defendants' Motion to Dismiss or for Summary Judgment at 31 (emphasis added).

10. *See, e.g., Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (adopting as norms, for purposes of review on the merits, agency's past practice and its representations to Congress); *State of Iowa v. Block,* 771 F.2d 347, 348–51 (8th Cir.1985), *cert. den.,* 478 U.S. 1012, 106 S.Ct. 3312, 3313, 92 L.Ed.2d 725 (1986) ("law to apply" deemed to include legislative history, a GAO report, and case law concerning judicial review of administrative action); *Cardo-*

*za v. Commodity Futures Trading Commission,* 768 F.2d 1542 (7th Cir.1985) ("law to apply" includes the agency's own regulations and past practice; also accorded weight is any *tradition* of reviewability of a given type of administrative action); *Vigil v. Andrus,* 667 F.2d 931, 932 (10th Cir.1982) (APA *procedural* requirements had to be met because of "the government's trust obligations to the Indians [and] the expectation of Congress in making appropriations," even where applicable statutes deemed too broad to give rise to the specific claimed entitlement); *Robbins v. Reagan,* 616 F.Supp. 1259, 1276 (D.D.C.1985), *aff'd,* 780 F.2d 37 (D.C.Cir. 1985) ("law to apply" included statement of Secretary of Health and Human Services, from which agency's subsequent departure was reviewable).

In addition to affirmative legislative expressions, agency action has also been deemed constrained by "[t]raditional principles of rationality and fair process." *Heckler,* 470 U.S. at 853, 105 S.Ct. at 1667 (Marshall, J., concurring).

In all, the Court concludes that the body of law controlling and guiding these agencies as they embark on such ventures as the Indian Children's Program is not "so devoid of objective benchmarks," *Davis Enterprises v. United States Environmental Protection Agency*, 877 F.2d 1181, 1188 (3d Cir.1989), or so lacking in "judicially manageable standards," *Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655,[11] as to consign such actions to the unreviewable discretion of the agencies. Moreover, the Court finds in the applicable law no " 'clear and convincing evidence' of a ... legislative intent [that] the courts restrict access to judicial review." [12] *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see also Heckler*, 470 U.S. at 840–55, 105 S.Ct. at 1660–68 (Marshall, J., concurring).

Nonetheless, for reasons discussed immediately *infra*, the purposes of this ruling require only that the Court recognize the presence of this extensive and broad legal substrate as the essence of its finding of reviewability. The Court today is not faced with any ripe question of applying this body of law to the administrative action at issue for assessment of the action's substantive validity under the "arbitrary and capricious," "substantial evidence," or "unwarranted by the facts" standards prescribed by 5 U.S.C. § 706(2).[13] Thus, the Court intimates no view on what the outcome of any such assessment might be.

### III.

At the next logical threshold is the "difficult but familiar" determination, *Batterton v. Marshall*, 648 F.2d 694 (D.C.Cir. 1980) whether the action terminating the Program was subject to the "notice and comment" requirements of the Administrative Procedure Act, 5 U.S.C. § 553, which Defendants concede were not followed.[14]

**11.** The type of agency decision *Heckler* found "presumptively unreviewable" due to a lack of "judicially manageable standards" involved assessing "whether agency resources are [to be] spent on this violation or another." *Id.* at 831, 105 S.Ct. at 1656. Defendants, arguing that the termination was actually a reallocation decision, apparently seek to fit the action here at issue into this category. But any resemblance to *Heckler* is superficial. The *Heckler* Court addressed an agency decision to decline to undertake a specific *enforcement* action on a single occasion, and the Court's language makes clear that it conceived its holding as limited to such a scenario. Here, the complaint is of the termination of an already-active agency program that had served handicapped Indian children, a broad class of beneficiaries.

Nor is this case like *Community Action of Laramie County, Inc. v. Bowen*, 866 F.2d 347 (10th Cir.1989), which declined to review an administrative decision to withdraw funding from a local Head Start unit over that unit's handling of a personnel matter. The administrative decision in *Laramie* was reached after notice and an extended hearing. In contrast, the case at bar concerns the summary termination of an entire service-providing support program.

**12.** To conclude otherwise in a case such as this would be tantamount to "frustrat[ing] Congressional intent" that agencies be held to their legislatively-prescribed missions. *Cf. Cardoza v. Commodity Futures Trading Commission*, 768 F.2d 1542, 1549 (7th Cir.1985).

**13.** *Cf. Vigil v. Andrus*, 667 F.2d 931 (10th Cir. 1982), which apparently undertook substantive review of a BIA program termination action without treating the threshold question of the termination's reviewability *vel non*, and therefore must implicitly have assumed or concluded that the termination was reviewable. *Andrus* found the termination procedurally invalid, and although it ultimately found no Indian entitlement to continuation of the program in its extant form, it so concluded on arriving at a factual finding of "Congress's knowledge of the ... program *and Congress's apparent desire to shift funding of the school lunch program to another agency." Id.* at 935 (emphasis added). Thus, one net effect of *Andrus* is that APA procedural requirements may be fully applicable to an action terminating or transforming a program even in the absence of a court finding of some substantive entitlement to continuation of that program.

In this case as in *Andrus*, the Court may properly decide whether the Program termination was subject to APA procedural requirements, although it is not prepared, as was the court in *Andrus*, to decide the substantive entitlement issue. In contrast with *Andrus*, nothing in the current record compels this Court to conclude that Congress desired or would have found unexceptionable the termination action of which Plaintiffs complain.

**14.** *See* Memorandum in Support of Defendants' Motion to Dismiss, Exhibit "S"; *see also id.* at 25 n. 17. Moreover, the parties do not dispute that the decision process did not include any participation by the BIA—one of the two sponsoring agencies.

This is one of the issues as to which Plaintiffs specifically seek summary judgment.

A motion for summary judgment properly may be granted only in cases where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Houston v. Nat'l General Ins. Co.,* 817 F.2d 83 (10th Cir.1987). The Court must view the record in the light most favorable to the existence of triable issues. *Exnicious v. United States,* 563 F.2d 418 (10th Cir.1977). When the nonmoving party will have the burden of proof at trial on a dispositive issue, it is required to respond by designating specific facts showing there is a genuine issue for trial. *Id.* at 324. In ruling on a motion for summary judgment, the Court does not weigh the evidence but rather asks whether, on the evidence before it, a reasonable jury could return a verdict for the nonmoving party. *Dreiling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1377 (10th Cir.1988).

To answer the question whether the "notice and comment" provisions of the APA apply, the Court must first determine whether the sponsoring agencies' termination of the Program was "rulemaking," and if so, whether it involved "substantive" or "legislative" rules as opposed to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A); *Batterton,* 648 F.2d at 701. Faced with such a gauntlet of categories, this Court is mindful that "[a]nalysis that improves upon semantic play must focus on the underlying purposes of the procedural requirements at issue." *Batterton,* 648 F.2d at 703.

The APA rulemaking requirements are animated by several related policies. The notice and comment requirement aims to ensure public participation and fairness to affected parties where agencies hold governmental authority, and to make available to the deciding agency all relevant facts and alternatives. *See id.* at 703–04; *see also Tabb Lakes Ltd. v. United States,* 715

F.Supp. 726 (E.D.Va.1988), *aff'd,* 885 F.2d 866 (4th Cir.1989). Indeed, an acknowledged central purpose of the APA is to ensure that "administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations." *Morton,* 415 U.S. at 232, 94 S.Ct. at 1073. A procedurally inadequate determination to deny benefits to Indians in frustration of their "legitimate expectation ... is inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *Id.* at 236, 94 S.Ct. at 1075 (quoting *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed.2d 1480, 1777 (1942)). Exceptions to procedural requirements are to be "reluctantly countenanced." *See New Jersey v. E.P.A.,* 626 F.2d 1038, 1045 (D.C.Cir.1980).

The Court finds as a matter of law that the termination decision amounts to a "legislative rule," *see Bellarno International Ltd. v. Food and Drug Administration,* 678 F.Supp. 410, 412 (E.D.N.Y.1988), and is hence subject to the APA rulemaking procedures set forth in 5 U.S.C. § 553, namely, that the decision be attended by advance notice published in the Federal Register, opportunity for interested parties to be heard, and an agency statement of the action's basis and purpose. *See Lewis v. Weinberger,* 415 F.Supp. 652, 661 (D.N.M. 1976). An "agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5), is "rulemaking" subject to rulemaking procedures. A "rule" is:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of ... facilities, ... services or allowances therefor ... or practices bearing on any of the foregoing[.]

5 U.S.C. § 551(4). Thus, as one court has observed, the APA "broadly defines an

agency rule to include nearly every statement an agency may make." *Batterton*, 648 F.2d at 700.

The advance publication and public comment requirements apply except to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), and except where the agency finds, and publishes with the rule, "good cause" to avoid the requirement. 5 U.S.C. § 553(b)(3)(B). However, the requirement that the *final* rule be published thirty days before its effective date applies even to "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(d)(2), again unless the agency finds, and publishes with the rule, "good cause" to avoid the requirement, 5 U.S.C. § 553(d)(3).

The action at issue here, even if characterized as a simple resource reallocation decision, cannot reasonably be considered a repeal of a mere rule of "agency organization, procedure, or practice." An internal agency practice or procedure "is primarily directed toward improving the efficient and effective operations of an agency, *not toward a determination of the rights [and] interests of affected parties.*" *Batterton*, 648 F.2d at 702 n. 34 (emphasis added); *id.* at 708 (the exemption "cannot apply … where the agency action trenches on substantial private rights and interests."). Neither can the action be characterized as a "general statement of policy," which is "merely an announcement of the policy which the agency *hopes to implement* in future rulemakings or adjudications." *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974). Finally, the action is clearly more than an "interpretive rule," which simply "serves an advisory function explaining the meaning given by the agency to a particular word or phrase in a statute or rule it administers." *Batterton*, 648 F.2d at 705.

Both "interpretive rules" and "general statements of policy" are marked chiefly by their *non-binding* effect and by the fact that they are "not determinative of issues or rights addressed." *See Batterton*, 648 F.2d at 702. With the record here affording no recourse to any single agency statement as the "pronouncement" which operated to terminate the Program, it is enough to conclude that the termination was of "binding effect" and preserved no "discretion" to continue to provide the array of services formerly provided by the Program.[15] *Cf.*, 678 F.Supp. at 412–15; *see also Batterton*, 648 F.2d at 702. In contrast with rules other than "legislative," it cannot reasonably be doubted that the unilateral decision to terminate the Program purported to "carry the force of law" and, adopting *arguendo* Defendants' policy-based rationale for the termination, that the action sought to "implement congressional intent" or "effectuate statutory purposes." *Batterton*, 648 F.2d at 701; *see* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 10. In that the termination operated to "grant rights, impose obligations, or *produce other significant effects on private interests*," *id.* at 701–02 (emphasis added), it is squarely within the category of "rules" to which rulemaking procedure applies. *Id.* The termination is, therefore, a "legislative rule" and not a mere "general statement of policy" for APA rulemaking purposes. Because "the agency action satisfies the APA's definition of a rule and eludes exemptions to § 553, it is procedurally defective unless promulgated with the procedures required by law." *Batterton*, 648 F.2d at 710.

Furthermore, Defendants' suggestion that the original promulgation of the Program was procedurally faulty or was without specific congressional authorization, even if true, has no effect on the applicability of the notice and comment requirement. *Cf. Andrus*, 667 F.2d at 935 (beneficiaries entitled to pretermination

---

**15.** There is no evidence that the agencies affirmatively provided alternative resources, in mitigation of the termination; rather, the record reveals that former Program patients were "on their own" in seeking such resources as might already be available, with the defunct Program playing at most an advisory role in this process. *See, e.g.,* Memorandum in Support of Defendants' Motion to Dismiss at 25 ("The purpose of the community close out meetings was to do networking, *i.e.,* match children to available services").

*procedure* even where statutory scheme found not to create any substantive entitlement to the terminated program). The Court must look beyond the agency's characterization of its own actions; the notice and comment requirement operates where agency action has "substantial impact" on the affected parties. *See, e.g., Lewis,* 415 F.Supp. at 661; *see also Andrus,* 667 F.2d at 938 (APA rulemaking procedural requirements applied where the subject action had "an adverse effect that is significant"); *cf. Federal Farm Credit Banks Funding Corporation v. Farm Credit Administration,* 731 F.Supp. 217, 223–24 (E.D.Va.1990).

A separate publication requirement, *see generally Lewis,* 415 F.Supp. at 658–61, is imposed by 5 U.S.C. § 552(a)(1), which provides:

> Each agency shall separately state and currently publish in the Federal Register for the guidance of the public ... substantive rules of general applicability adopted as authorized by law, and statements of general policy and interpretations of general applicability formulated and adopted by the agency[.]

Thus, to be subject to this requirement, the termination need only amount to a "statement of general policy." In fact, the termination is a "legislative rule" which meets and exceeds the definitional standards applicable to a "statement of general policy." *Cf. Batterton,* 648 F.2d at 709–10 n. 89 ("publication under [§ 552(a) ], if anything, should be easier to secure than under [§ 553], given the language and purposes of the two statutes.") The centrally relevant finding here has already been made with respect to the rulemaking requirements of § 553: the action at issue represents a decision to cease providing direct health support services to a significant number of beneficiaries, and as such effects "a direct and significant impact upon the substantive rights of the general public or a segment thereof." *Lewis,* 415 F.Supp. at 659; *cf. Batterton,* 648 F.2d at 708 n. 83. This is a case involving the "substantive right" of Indians to continue receiving the health care services and other support hitherto furnished to them by the very agencies created to fulfill that mission. *See*

*Andrus,* 667 F.2d at 939 ("when depriving the Indians of benefits that have long been provided them, the government must 'bend over backwards' to assure fair treatment."). In addition, the termination decision implicates the agencies' responsibility in "creating reasonable classifications and eligibility requirements to aid in allocating limited funds for Indian welfare services," *Lewis,* 415 F.Supp. at 659 (citing *Morton,* 415 U.S. at 230–31, 94 S.Ct. at 1072 (1973)), and its publication serves as a check against arbitrariness and as a guide for public expectations, *id.* at 660–61.

Finally, this Court's conclusion that the perfunctory termination of the Program was procedurally inadequate is bolstered by the special solicitude the Supreme Court has prescribed in those situations in which an agency decision amounts to a *change of course:*

> [R]evocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to proper course.... Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

*Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *see also Robbins,* 616 F.Supp. at 1275 ("such a requirement ... is necessary to protect the honor and integrity of government" and is not limited to published rules and regulations.). The case at bar, both according to the record and by Defendants' own admissions, involves just such an agency "change of course."

■ Given this Court's conclusion that the termination action was subject to procedural requirements which it undisputedly failed to meet, Plaintiffs' bid for substantive review of the merits of the termination presents no question ripe for this Court's decision, *see Bellarno,* 678 F.Supp. at 416; *see also Lewis,* 415 F.Supp. at 662. Without the benefit of the enriched record re-

sulting from proper public notice and comment at the administrative level, the Court would be called upon to "decide this issue in the abstract," for "[o]nly after these rule making procedures are completed is the court equipped to decide whether a legislative rule is arbitrary, capricious or issued in excess of statutory authority." *Id.* at 416. Alternatively, because an agency is not entitled to take final rulemaking action without first executing § 553 procedures, action not taken in this manner is untimely and must be deemed to remain subject to the agency's modification, recall, abandonment, or reconsideration—rendering judicial review premature. *Id.* Thus, instead of undertaking substantive review immediately, an appropriate course would be to declare the termination action invalid and order the Program reinstated. *See* 5 U.S.C. § 706(2)(D); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). Then, if a party wishes to challenge substantively any future termination of the Program, it may do so after the termination has been promulgated in a procedurally valid manner. *Cf. Batterton*, 648 F.2d at 711.

The Court concludes and declares that the decision to terminate the Indian Children's Program is ineffective for lack of publication in the Federal Register and for noncompliance with the rulemaking procedures of the APA. 28 U.S.C. § 2201; 5 U.S.C. §§ 706(2)(D), 552(a)(1), 553; *see also Lewis*, 415 F.Supp. at 661. For reasons discussed *supra*, the Court today need not and does not reach any of the parties' many remaining arguments, including Plaintiffs' constitutional attacks and their apparent attempt to proceed directly under the doctrine setting forth the federal trust duty to Indians.

Logic favors immediate reinstatement of a program terminated in violation of law. *Cf. Alexander v. Hillman*, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192 (1935). Plaintiffs seek this result as part of the injunctive relief they request in the Complaint. However, because Plaintiffs' motion for summary judgment is a partial one limited to their requests for declaratory relief, Plaintiffs have developed no argument addressed to the issuance of an injunction—with the re-

sult that Defendants have had no meaningful opportunity to oppose one. Accordingly, the Court is constrained to order supplemental briefing on this issue before proceeding further. *See* 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.").

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that Defendants' Motion to Dismiss for Lack of Jurisdiction and in the Alternative For Summary Judgment, and that same Motion as joined and supplemented by Interior Defendants, be, and hereby is, DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion for Partial Summary Judgment is GRANTED insofar as the Court declares that the decision to terminate the Indian Children's Program is unlawful, and therefore ineffective, for lack of publication in the Federal Register and for noncompliance with the rulemaking procedures of the Administrative Procedure Act.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that within fifteen days from the date of this Memorandum Opinion and Order, the parties shall submit supplemental briefs addressed solely to the question whether an injunction should issue compelling reinstatement of the Indian Children's Program as it existed and functioned immediately prior to its termination in 1985.

### SUPPLEMENTAL OPINION

■ THIS MATTER is before the Court on the Supplemental Memoranda filed by Plaintiffs and Defendants pursuant to this Court's July 6, 1990 Memorandum Opinion and Order ["July 6 Opinion"] page 1471, in which the parties were directed to tender additional submissions addressed solely to the question whether an injunction should issue compelling reinstatement of the Indian Children's Program ["Program"] as it existed and functioned immediately prior to

its termination in 1985. The relevant facts were set forth in the July 6 Opinion and need not be repeated. Having reviewed the pleadings, the evidence of record and the relevant law, the Court now determines, in its discretion, that the decree contemplated in the July 6 opinion will be entered.

Preliminarily, even before reaching the analysis that traditionally governs questions of equitable relief, the case for the injunction is compelling. Absent a decree compelling reinstatement of the Program, the significance of the declaratory relief already ordered by the Court would be more symbolic than real—a state of affairs which would contravene the bedrock remedial principle that courts should "decree complete relief." *Alexander v. Hillman,* 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935). In addition, the ongoing illegality that arose from the Program's improper termination, see p. 1473, cannot rationally be deemed cured without the Program being again in operation. Indeed, this straightforward notion is implicit at several points in the statutory schemes applicable here and in the cases elaborating them. *See, e.g.,* 5 U.S.C. § 706(2)(D) ("court *shall* ... set aside [procedurally invalid] agency action") (emphasis added); 28 U.S.C. § 2202; *Anderson v. Butz,* 550 F.2d 459 (9th Cir.1977); *Prows v. United States Department of Justice,* 704 F.Supp. 272 (D.D.C.1988); *Lewis v. Weinberger,* 415 F.Supp. 652 (D.N.M.1976); *see also Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847 (D.C.Cir.1987), *cert. denied,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987) (where the requirements of the Administrative Procedure Act are not met, a court can properly vacate the offending rule and restore the *status quo ante* ).

In fact, the same ultimate result follows under the traditional equity analysis regarding which the parties have now had opportunity to submit fuller argument. A request for injunctive relief is addressed to the Court's discretion. *See Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1485, 36 L.Ed.2d 151 (1973). To focus this discretion, courts have inquired, first, whether the movant has demonstrat-

ed the lack of an adequate remedy at law. *See, e.g., Beacon Theatres v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959). Typically, the movant demonstrates the inadequacy of any legal remedy by showing that it will suffer irreparable harm if the Court does not intervene and prevent the impending injury. *Cf. City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310 (10th Cir.1985); *see also Otero Savings and Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275, 278 (10th Cir. 1981) ("irreparable injury" showing required for preliminary injunction). Having found that Plaintiffs have succeeded on the merits of their underlying claim that termination of the Program was procedurally invalid, at 1483, the Court can next proceed to the determination whether the balance of equities favors the granting of injunctive relief, whether an injunction would be adverse to the public interest, and what particular form any injunctive relief should take. *See Sierra Club v. Alexander,* 484 F.Supp. 455, 471 (N.D.N.Y.1980), *aff'd,* 633 F.2d 206 (2d Cir.1980); *see also Otero Savings and Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275 (10th Cir.1981) (preliminary injunction).

Plaintiffs have produced abundant and uncontroverted evidence that the Plaintiff class has suffered and will continue to suffer irreparable harm—in particular, impaired health and development—without the services the former Program provided. Moreover, failure to reinstate the Program would irreparably harm Plaintiffs' interest in ensuring that the integrity of the administrative rulemaking process is maintained and that they are afforded a meaningful opportunity to comment before implementation of rules such as that which terminated the Program. *See Community Nutrition Institute v. Butz,* 420 F.Supp. 751, 757 (D.D.C.1976); *Dow Chemical, USA v. Consumer Product Safety Commission,* 459 F.Supp. 378, 395, *on rehearing,* 464 F.Supp. 904 (W.D.La.1978). Both of these interests of Plaintiff class are also specific embodiments of weighty and well-established public interests. *See* 25 U.S.C. § 13; 25 U.S.C. § 1602; *Morton v. Ruiz,* 415 U.S. 199, 232, 236, 94 S.Ct. 1055, 1073, 1075, 39

L.Ed.2d 270 (1974); *Dow Chemical,* 459 F.Supp. at 395.

As to balancing the equities, Defendants make no viable showing that reinstatement of the Program would effect any hardship—to themselves or to the general public—outweighing the principal benefit of such reinstatement: furtherance of Plaintiffs' interest in obtaining the fullest possible array of essential diagnostic, evaluation, treatment planning and therapy services. Defendants' supplemental brief is preoccupied with attacking the July 6 Opinion, at the notable expense of its treatment of the specific question on which the Court had ordered further submissions. Defendants' attempt to reargue their case before this Court is as unavailing [1] as it is inappropriate.

On finally arriving at the issue framed by the Court, Defendants are content to flatly declare: "There are no Snyder Act funds appropriated or available to Interior to fund a reinstated ICP." Defendants' Supplemental Brief at 15. This and Defendants' other bald declarations of agency incapacity must not and do not serve to bar entry of appropriate injunctive relief where, as here, the requisites for that relief are met. Moreover, the allegations of incapacity, as Defendants develop them, appear to be specific to the BIA.

Defendants do not say why reinstatement of the Program would entail redirection of any appropriated funds away from "the objects for which the appropriations were made." *Cf.* 31 U.S.C. § 1301(a). Indeed, Defendants vaguely inveigh against wrongful reallocation of "the above described funds which are direct service dollars" while producing virtually nothing in the way of specific facts or monetary figures to support their dire claims of "damage the proposed injunction may cause" them. *Cf. City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310, 312 (10th Cir.1985). As their attempt to demonstrate such damage, Defendants have crafted a string of unsupported premises and conclusions. Defendants' terse pronouncements—for example, that "Interior defendants would have to terminate current direct educational handicapped services in Papago, Albuquerque, Navajo, Phoenix with several BIA schools, P.L. 93–638 contract schools and P.L. 100–297 grant schools that provide direct educational handicapped services to the BIA eligible population of handicapped Indian children" —appear to rely principally on equally conclusory recitations in the affidavit of Dr. Edwin Cobb. Similarly unfounded is Defendants' lament that "[i]n order to finance the reestablishment of the BIA portion of ICP, BIA would have to recoup EHA [Education of the Handicapped Act] funds as identified in the application of the local educational area and agencies that service the former ICP population."

Significantly, Defendants mount no effective attack on Plaintiffs' showing that the current array of health care support services available and actually provided to handicapped Indian children does not

---

1. The Court observes in passing that Defendants both ignore and mischaracterize the reasoning in the July 5 Opinion. For example, Defendants squander several pages taking the Court to task in the apparent and mistaken belief that the Court relied *solely* on its findings concerning the impact of the rule in determining it to be legislative. In so doing, moreover, Defendants fail to take account of case law in which the impact of a rule was not deemed "irrelevant" to the determination whether notice and comment requirements ultimately applied. *See, e.g., Carribean Produce Exchange, Inc. v. Secretary of Health and Human Services,* 893 F.2d 3, 8 (1st Cir.1989) (citing *Levesque v. Block,* 723 F.2d 175, 182 (1st Cir.1983)) ("substantial impact" is "a factor" particularly in assessing whether agency action sought to have "legislative" significance); *American Hospital Association v. Bowen,* 834 F.2d 1037, 1046 (D.C.Cir.1987) (finding "substantial impact" not alone determinative, but citing as subject to notice and comment requirements the adoption of parole guidelines "calculated to have a substantial effect on ultimate parole decisions"); *Id.* at 1047 (focus of inquiry broader than, but still inclusive of, substantiality of impact); *Id.* at 1058–62 (Mikva, J., concurring in part and dissenting in part); *Prows v. United States Department of Justice,* 704 F.Supp. 272, 276–77 (D.D.C.1988) (rulemaking procedures applicable where the action "substantially affects the rights of those subject to it"); *see also Vigil v. Andrus,* 667 F.2d 931, 939 (10th Cir. 1982) ("the BIA acted improperly in failing to follow APA rulemaking procedures before adopting changes affecting large numbers of Indian families").

amount to the equivalent of the unlawfully terminated Indian Children's Program— that members of Plaintiff class are currently receiving less of, or are doing without, a number of services the Program used to provide. It would defy logic to infer that these deficits do not matter simply because the current web of support services might in certain other respects provide more or better care than the Program did. In addition, Defendants do not refute Plaintiffs' proposition that their own resources, as individuals, are more severely constrained than those of the agencies and hence less adequate to the task of securing the relief for which they have demonstrated a need.

Defendants allude to other perceived impediments to a decree reinstating the Program: the prospect of changing the *status quo,* the threat of forced termination of other "handicapped service programs" provided pursuant to statutory schemes, the burden of hearings necessitated by curtailment of existing services, and a need to solicit competitive bids in restoring the Program. Yet Defendants marshal neither facts nor well-grounded legal argument in support of these feared effects and, certainly without such support, none of them would suffice to bar the decree at issue. Finally, Defendants' elliptical argument that *laches* is somehow implicated by Plaintiffs' filing an action a year after the termination, and therein requesting permanent but not temporary injunctive relief, lacks adequate support in any of their cited cases and is without merit.

It is curious—indeed, incongruous—that Defendants should predicate their premonitions of widescale disaster among existing support structures simply upon the reinstatement of a program that they themselves characterize as "a small staff of IHS headquarters and BIA contract supported professionals and administrative support personnel varying in number from approximately 11 to 16 people." Defendants' Supplemental Brief at 4. In this light, and in view of the terseness and generality of their assertions of potential damage, Defendants' attempt to establish "undue hardship" is disingenuous and wholly unconvincing.

Finally, notwithstanding the redress that the APA scheme clearly commands in this matter, Defendants make no real effort to show either factually or logically that *no* equitable relief could be fashioned that would operate to restore the *status quo ante* without entailing the ills (duplication and deprivation of since-initiated services) they perfunctorily recite. Yet the Court today fashions a decree that bars both needless duplication and curtailment of currently provided services.

The Court shall grant Plaintiffs' request for an injunction reinstating the Indian Children's Program and shall deny Defendants' unsupported request for "a stay pending appeal of the Court's decision." Under Federal Rule of Civil Procedure 65(d), an order granting an injunction "shall be specific in terms" and "shall describe in reasonable detail ... the act or acts" to be enjoined, so that parties will have adequate notice of what they must do to comply with or implement the injunction. *See Williams v. United States,* 402 F.2d 47 (10th Cir.1967).

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that Defendant agencies, jointly, by and through Defendant executive officers of these agencies, the Secretary of the Interior and his successors, the Secretary of Health and Human Services and his successors, the Director of the Indian Health Service and his successors, and the Assistant Secretary of the Interior–Indian Affairs and his successors, are hereby enjoined—

1. To reconstitute the Indian Children's Program ["Program"] as it existed and functioned immediately prior to its termination in 1985, and in so doing—

    a. To procure the functional equivalent, in number and qualifications, of the former staff of the Program, thereby providing Plaintiffs with a multi-disciplinary team of the same professional credentials, calibre, and staff size as was provided under the former Program; and,

    b. To provide Plaintiffs, through the reconstituted Program, with the same services, in type, range, quality, and

manner of delivery, as were provided under the former Program; and,

2. To accomplish this restoration of the Program within 180 days from the date of entry of this decree; and,

3. To, within this 180-day period, contact all those children and their families who were being served by the former Program or were in active Program files at the time the former Program terminated services, notify them of the reinstatement of the Program, and provide them with the immediate opportunity to have their current condition assessed to determine how they may resume their relationship with the Program in the manner best suited to their optimum health and development; and,

4. To continue to operate the Program, as herein described, until such time as it is terminated in accordance with all applicable law.

Provided, that—

1. The reconstituted Program is not required to provide those services available to Plaintiff class, and actually provided to Plaintiff class, through any program in operation under the Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.*, ["EHA program"] during the time periods that any such EHA program actually provides such services to Plaintiff class; and,

2. At no time hereafter are any EHA program services to be impaired or curtailed on account of any activity undertaken in reconstituting or operating the Program or in performing any other duties under this Decree; and,

3. Defendants are at all times hereafter to perform their duties under this decree with such care, skill, and efficiency as will enable them to minimize disruptions in the provision and delivery of services under existing programs and to maximize availability and accessibility of the totality of applicable health care support services to Plaintiff class.