953 F.2d 1225
 2 NDLR P 188
 Grover VIGIL, Charlene Vigil, as General Guardians and Next
Friends for Ashley Vigil, a minor person, Kee Sandoval, Judy
Sandoval, as General Guardians and Next Friends for
Kristofferson Sandoval, a minor person, Angela Allen, as
General Guardian and Next Friend for Angelo Allen, a minor
person, individually and on behalf of all other persons
similarly situated, Plaintiffs-Appellees,
v.
Everett R. RHOADES, M.D., Director of the Indian Health
Service, his agents, employees, and successors, Otis R.
Bowen, Secretary of the Department of Health and Human
Services, his agents, employees, and successors, the
Department of Health and Human Services, Donald O. Hodel,
Secretary of the Department of the Interior, his agents,
employees, and successors, Ross Swimmer, Assistant Secretary
of the Interior-Indian Affairs, Bureau of Indian Affairs,
United States Department of the Interior, United States of
America, Defendants-Appellants.
 No. 90-2235.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 15, 1992.
 
 Joel R. Jasperse, Northern New Mexico Legal Services, Gallup, N.M., for plaintiffs-appellees.
 Andrew C. Mergen, Atty., Environmental and Natural Resources Div., Dept. of Justice, Washington, D.C. (Richard B. Stewart, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., William L. Lutz, U.S. Atty., Ronald F. Ross, Raymond Hamilton, Asst. U.S. Attys., Albuquerque, N.M., John A. Bryson, Attorney, Environmental and Natural Resources Div., Dept. of Justice, Washington, D.C., Duke McCloud, Attorney, Dept. of Health and Human Services, Rockville, Md., Duard R. Barnes, Asst. Sol., Dept. of the Interior, Washington, D.C., with him on the brief), for defendants-appellants.
 Before SEYMOUR, BARRETT and BALDOCK, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 The government appeals from the district court's grant of summary judgment in favor of the Plaintiffs-appellees, a certified class of handicapped Indian children who have received or will be eligible to receive clinical services from the Indian Health Service (IHS) pursuant to the Indian Children's Project (Project). The IHS is an agency within the Department of Health and Human Services. It began the Project in the late 1970's in conjunction with the Bureau of Indian Affairs (BIA), a Department of the Interior agency, in order to provide clinical services to handicapped Indian children residing in the southwestern United States. In 1985, the IHS decided that Project staff would be better utilized as consultants to other IHS programs nationwide. IHS subsequently terminated the Project clinical services and reassigned its staff without affording notice and comment procedures.
 
 
 2
 The Plaintiffs brought this suit seeking declaratory and injunctive relief. They claimed that the termination of services violated the federal trust responsibility to Indians, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq., the Snyder Act, c. 115, 42 Stat. 208 (1921) (codified as amended at 25 U.S.C. § 13), the Indian Health Care Improvement Act, Pub.L. No. 94-437, 90 Stat. 1400 (1976) (codified as amended at 25 U.S.C. §§ 1601-1680j), various agency rules and regulations, and their Fifth Amendment due process rights. Plaintiffs moved for partial summary judgment, Fed.R.Civ.P. 56(c), and the government moved for dismissal for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), or, in the alternative, summary judgment. The district court held that the termination was subject to judicial review and, as a legislative rule, was subject to the APA's notice and comment procedures as set forth at 5 U.S.C. § 553. Vigil v. Rhoades, 746 F.Supp. 1471 (D.N.M.1990). Given the IHS's concession that it did not provide notice and comment, the district court employed a traditional equitable analysis and granted affirmative injunctive relief requiring the IHS to reinstate the Project. Id. at 1483-87.
 
 
 3
 The government argues that (1) the termination was not judicially reviewable under the APA because it was committed to agency discretion, 5 U.S.C. § 701(a)(2), or, in the alternative, (2) the termination was not subject to notice and comment procedures under the APA because it was not a legislative rule, id. § 553, and (3) the termination was not arbitrary and capricious or an abuse of discretion under the APA, id. § 706(2)(A). We find no error in the district court's analysis, see 746 F.Supp. 1471, and we affirm the judgment.
 
 I. Background
 
 4
 The background of the Indian Children's Project is clouded in bureaucratic haze. Nevertheless, we recount it here largely from undisputed facts in the record and Congressional hearings testimony. The Project was funded pursuant to two Acts of Congress, the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act (IHCIA), 25 U.S.C. §§ 1601-1680j. The Snyder Act, Congress' formal legislative authorization for Indian welfare, requires the Secretary of Health, Education and Welfare to "direct, supervise, and expend [Congressional appropriations] for the benefit, care, and assistance of the Indians throughout the United States for ... relief of distress and conservation of health." 25 U.S.C. § 13.[1] In addition, Title II of the IHCIA provides for supplemental appropriations for several broad categories of Indian health care, including "mental health." 25 U.S.C. § 1621(a)(4)(D). Under the mental health provision, Congress authorized the IHS to establish "[t]herapeutic and residential treatment centers." Id. These centers were to come about pursuant to "a major cooperative care agreement between the IHS and the BIA using suitable BIA facilities in convenient locations." H.R.Rep. No. 1026, 94th Cong., 2d Sess. 81 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News 2652, 2719.
 
 
 5
 Congress did not fund the treatment centers for disturbed children; however, the IHS allocated $292,000 and 11 positions from its fiscal year 1978 general IHCIA Title II appropriation to the IHS Headquarters mental health branch in Albuquerque, New Mexico for the planning and development of a handicapped children's project, the Indian Children's Project. The Project then began providing services to handicapped Indian children partially in an effort to assess the need for a treatment center--instead of using BIA facilities as Congress had envisioned, the IHS planned on constructing its own diagnostic and treatment center. IHS later requested a $3.5 million appropriation from Congress for the center. Department of the Interior and Related Agencies Appropriations for 1980: Hearings before the House Subcommittee on the Department of the Interior, 96th Cong., 1st Sess., pt. 8 at 245-252. Congress did not fund the center, but appropriated $300,000 for fiscal year 1980 to the IHS for development and expansion of the Project to a national level in conjunction with the BIA.[2]
 
 
 6
 BIA began participating in the Project in 1979 by allocating $350,000 of year-end funds for contract services. By 1980, the BIA and IHS had entered a memorandum of agreement that provided for a joint effort to serve handicapped Indian children through direct or contracted clinical treatment. App., Ex. 6. Apparently, the effort to persuade Congress to fund a treatment center was forgotten, and the Project staff concentrated primarily on diagnosis and treatment of handicapped Indian children in the Southwest. This effort continued on a regional basis until IHS terminated direct clinical services in August 1985. As of August 1985, the staff was following 426 handicapped children. BIA continues to follow handicapped Indian children pursuant to its educational responsibilities under the Education for All Handicapped Children Act of 1975 (EAHCA), Pub.L. No. 94-142, 89 Stat. 774 (codified as amended at 20 U.S.C. §§ 1400 et seq.). The government contends that Plaintiffs are eligible for a "comprehensive array" of services pursuant to the EAHCA; however, the record contains no documentary evidence that services comparable to the former Project services are available in the reservation communities of the 426 children followed as of August 1985.
 
 II. Disposition
 
 7
 Pursuant to the APA, any person legally aggrieved by a final agency action presumptively is entitled to judicial review thereof. See 5 U.S.C. §§ 702, 704 (provisions regarding presumptive review and finality respectively). Nevertheless, a federal district court's subject matter jurisdiction over an APA claim arises under 28 U.S.C. § 1331. See Chrysler Corp. v. Brown, 441 U.S. 281, 317 n. 47, 99 S.Ct. 1705, 1725 n. 47, 60 L.Ed.2d 208 (1979) (citing Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). This jurisdiction, however, is not without exception. The APA provides that an agency action is reviewable "except to the extent that--(1) statutes preclude judicial review; or (2) [the] agency action is committed to agency discretion by law." 5 U.S.C. § 701. If either APA preclusion applies, federal subject matter jurisdiction under 28 U.S.C. § 1331 does not exist. See Califano, 430 U.S. at 105, 97 S.Ct. at 984 (§ 1331 jurisdiction subject to federal "preclusion-of-review statutes"). See also Robbins v. Reagan, 780 F.2d 37, 57 (D.C.Cir.1985) (Bork, J., dissenting). In its Fed.R.Civ.P. 12(b)(1) motion, the government argued that IHS's Project termination decision fell under the § 701(a)(2) preclusion for actions "committed to agency discretion by law." We review this jurisdictional argument de novo. See Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 641 (10th Cir.1990). We also review the summary judgment determination de novo, using the same standard as the district court. Osgood v. State Farm Mut. Auto Ins. Co., 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties agree that no material factual disputes exist in this case; the arguments are strictly legal.
 
 
 8
 The Supreme Court has stated that the § 701(a)(2) preclusion of judicial review for matters committed to agency discretion is "very narrow." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). It applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Id. (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). In Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), the Court elaborated on the issue in the context of the Food and Drug Administration's decision not to enforce certain federal statutes. The Chaney Court held that judicial review of an agency nonenforcement decision is not available unless Congress clearly indicates to the contrary. Id. at 838, 105 S.Ct. at 1659. This is so because of the "general unsuitability for judicial review of agency decisions to refuse enforcement." Id. at 831, 105 S.Ct. at 1655. Such decisions are unsuitable for review in part because Congress normally does not provide "meaningful standards for defining the limits of [enforcement] discretion." Id. at 834, 105 S.Ct. at 1657. Although the Chaney Court dealt with a nonenforcement decision, it set forth a principle applicable to all agency actions--"review is not to be had if the statute is drawn so that a court could have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830, 105 S.Ct. at 1655. Even after Chaney, however, the general exception to judicial review "for action 'committed to agency discretion' remains a narrow one." Id. at 838, 105 S.Ct. at 1659.
 
 
 9
 The Court's most recent pronouncement on this issue came in Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), a case dealing with the Central Intelligence Agency Director's decision to terminate an employee for purported security reasons. The Webster Court stressed the need for a careful examination of the language and structure of the statutes which provide the basis for the alleged agency illegality. Id. at 600, 108 S.Ct. at 2052. The Court also noted that agency regulations, in the absence of meaningful statutory standards, may provide a basis for review. Id. at 602 n. 7, 108 S.Ct. at 2052 n. 7. In that case, the language of the National Security Act of 1947 (NSA) § 102(c), 50 U.S.C. § 403(c), provided unfettered discretion to the Director of Central Intelligence to terminate any employee, and the overall structure of the NSA revealed an overriding need for security in the CIA employment process. Webster, 486 U.S. at 600-01, 108 S.Ct. at 2052. Furthermore, the agency's own regulations allowed for maximum discretion. See id. at 602 n. 7, 108 S.Ct. at 2053 n. 7. Under the circumstances, the Court found no manageable standards with which to review the employment termination and therefore applied the § 701(a)(2) exception.[3]
 
 
 10
 Since Webster this court has had ample opportunity to apply the § 701(a)(2) exception.[4] The government, however, relies primarily on one case, Community Action of Laramie County, Inc. v. Bowen, 866 F.2d 347 (10th Cir.1989) [hereinafter CALC ], in support of its argument that the Project termination in this case is unreviewable. In CALC, we examined the language and structure of the Head Start Act (HSA), Pub.L. No. 97-35, Title VI, §§ 635 et seq., 95 Stat. 499 et seq. (1981) (codified as amended 42 U.S.C. §§ 9831-58), as well as its underlying regulations, see, e.g., 45 C.F.R. §§ 1303.33(b), 1303.36(b), in search of manageable standards with which to review the termination of funding of a local Head Start grantee. The Department of Health and Human Services had terminated funding for the grantee largely because of a vexatious political dispute between the grantee and the local Head Start policy council. CALC, 866 F.2d at 353-54. We found no manageable standards in the applicable statutes and regulations, and we emphasized the unsuitability for judicial review of agency funding decisions: "Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.' " Id. at 354 (quoting Alan Guttmacher Inst. v. McPherson, 597 F.Supp. 1530, 1536-37 (S.D.N.Y.1984), aff'd, 805 F.2d 1088 (2d Cir.1986)). See also International Union, United Autoworkers v. Donovan, 746 F.2d 855, 861 (D.C.Cir.1984) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."), cert. denied, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985).
 
 
 11
 The government contends that the termination of the Project services in this case is similar to the grant termination in CALC; that is, a mere funding determination which is unsuitable for judicial review. Indeed, specific manageable standards for reviewing the funding termination are difficult to find in the Snyder Act, the EAHCA and the IHCIA, three sources relied upon by the district court as "ample 'law to apply.' " See 746 F.Supp. at 1477. The Plaintiffs have not cited any statute or regulation which even refers to the Project or provides specific standards for reviewing its termination. Perhaps this is due to the complex background of the Project. As the government contends, the Project appears to have been created at the discretion of the IHS in furtherance of the Congressional intent expressed in the Snyder Act and the IHCIA provision for "[t]herapeutic and residential treatment centers" as described in the IHCIA at 25 U.S.C. § 1621(a)(4)(D).[5] See supra p. 1227. And it is difficult to see a correlation between the Project as it was upon termination in 1985 and the treatment centers envisioned by Congress. Nevertheless, the district court was correct in finding that Congress "had learned of the existence of the Program and cognized that fact in fashioning its Indian-related appropriations...." See 746 F.Supp. at 1477.
 
 
 12
 We have examined Congressional hearings testimony and reports from 1980, the year Congress appropriated $300,000 for the Project, see supra note 3 and accompanying text, through 1985, the year IHS terminated the Project. Each year, IHS represented to Congress that it was funding the Project in order to provide services for handicapped Indian children. For example, for fiscal year 1984, IHS represented to a House appropriations subcommittee that:
 
 
 13
 The Indian Children's Program (ICP) continues to function as a regional interagency IHS-BIA/Office of Indian Education Programs (OIEP) project serving emotionally, educationally, physically and mentally handicapped American Indian children and youth in the southwest. For individual children, the ICP is providing diagnostic, evaluation, treatment planning and followup services. For parents, community groups, school personnel and health care personnel, the ICP is providing training in child development, prevention of handicapping conditions, and care of the handicapped child.... This activity responds to continued congressional interest in a national collaboration on behalf of handicapped children.... Financially the ICP is supported by both IHA and BIA/OIEP in an approximate 65-35 ratio. IHS ... funds are expended under the mental health budget activity. Additional IHS funding appropriated by Congress in FY 1980 is expended under the hospitals and clinics budget activity.
 
 
 14
 Department of the Interior and Related Agencies Appropriations for 1984: Hearings before a Subcommittee of the Committee on Appropriations, House of Representatives, 98th Cong., 1st Sess., pt. 3, 351 (1983) (narrative Mental Health Budget Justification report submitted to subcommittee). In response, the subcommittee report states:
 
 
 15
 Indian Children's Program ... the Committee is pleased to hear of the continued success of the Indian Children's Program, and expects IHS to include information in next year's budget justification regarding its participation and details of funds to be provided to this effort.
 
 
 16
 Id. The IHS made similar representations in the form of testimony and narrative submissions before the same subcommittee for each year that the Project existed.[6]
 
 
 17
 The government contends that these snippets of Congressional hearings testimony and subcommittee reports do not constitute manageable standards for review. Yet, at a minimum, the hearings testimony and reports clearly demonstrate that Congress was informed of and intended to fund the Project, albeit through general appropriations, throughout the Project's entire existence. This is unlike CALC; whereas CALC involved a termination of the funding of one grantee among hundreds involved in the Head Start program, this case involves the summary termination of the program itself.
 
 
 18
 The Congressional intent to fund the Project, in combination with the special relationship between the Indian people and the federal government, strongly suggests a jurisdictional basis for review. In Vigil v. Andrus, 667 F.2d 931 (10th Cir.1982), we relied on Congressional hearings testimony and reports in finding that Congress was aware of a BIA school lunch program and intended that all Indian school children, regardless of family income, be eligible for participation in the program--this, in spite of a general appropriation and lack of specific statutory mandate for a school lunch program. BIA had transferred its lunch program to the Department of Agriculture, and, in the process, Department of Agriculture maximum family income requirements had eliminated many Indian children from eligibility. Interpreting the leading Supreme Court case in the area of Indian welfare programs, Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), we stated that "the government has assumed almost a guardian-ward relationship with the Indians by its treaties with the various tribes and its assumption of control over their property. This suggests that the withdrawal of benefits from Indians merits special consideration." Andrus, 667 F.2d at 936. See generally Felix S. Cohen's Handbook of Federal Indian Law, ch. 3, § C2c, 225-228 (1982) (discussing federal administrative trust responsibility to Indians, noting that "ordinary standards of a private fiduciary must be adhered to by executive officials administering Indian ... programs"). Compare Kenai Oil & Gas, Inc. v. Dept. of the Interior, 671 F.2d 383, 386 (10th Cir.1982) ("fiduciary responsibilities vested in the United States as trustee of Indian lands" provided adequate basis for judicial review).
 
 
 19
 It suffices to state that this "special consideration" provides an appropriate backdrop for judicial review of the agency action, particularly in light of Congress' recurring budgeting recognition of the Project. When the government "depriv[es] the Indians of benefits that have long been provided them, [it] must 'bend over backwards' to assure fair treatment." Andrus, 667 F.2d at 939. Given this overriding duty of fairness and the Snyder Act's general provision for "the relief and conservation of health," 25 U.S.C. § 13, it was appropriate for the district court to exercise jurisdiction. See 746 F.Supp. at 1478 (district court correctly states that Snyder Act's general purpose provides "a palpable question: whether the action ultimately does redound to the 'benefit, care and assistance' of Indians").[7]
 
 
 20
 Moreover, the district court was correct in holding that APA notice and comment proceedings were necessary in this case. See 746 F.Supp. at 1479-83. The case is indistinguishable from Andrus, in which we held that Ruiz, 415 U.S. 199, 94 S.Ct. 1055, stands for the proposition that notice and comment procedures should be provided any time the government "cuts back congressionally created and funded programs for Indians" even when the Indians have no entitlement to the benefits. Andrus, 667 F.2d at 936. The government attempts to distinguish Andrus, contending that it dealt only with an eligibility for benefits requirement, a "classic rule," whereas this case involves a simple reallocation of resources. Government's brief at 35. This argument, however, was answered very clearly in Andrus:
 
 
 21
 Ruiz specifically focused on the BIA's duty to be fair in informing the Indians of changes in eligibility requirements for general assistance benefits, but the case may be read more broadly to require the BIA to follow rulemaking procedures whenever it cuts back congressionally created and funded programs for Indians.
 
 
 22
 667 F.2d at 936. As we have already decided, the Project was Congressionally created and funded, and there is no question that benefits were "cut back;" the entire program was eliminated. Therefore, rulemaking procedures should have been followed.[8]
 
 
 23
 Exercising de novo review over the district court's summary judgment determination, we find no error in its analysis of the rule making issue. See 746 F.Supp. at 1479-83. The Plaintiffs were legally entitled to relief, and therefore, summary judgment was appropriate. Regarding the form of relief, reinstatement of the Project, see id. at 1483-87 (supplemental opinion), we express no opinion because the government has not raised the issue.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 The Snyder Act encompasses other Indian programs and initially concerned only Bureau of Indian Affairs spending, but the Indian Health Facilities and Hospitals Act, c. 658, § 1, 68 Stat. 674 (1954) (codified as amended at 42 U.S.C. § 2001), transfers authority for Indian health care to the Secretary of Health, Education and Welfare
 
 
 [2]
 The House Report regarding the appropriation bill states:
 In addition, the Committee has provided an increase of $300,000 for expansion of the handicapped children's program. The Funds will be used to provide diagnostic service to children with complex problems who reside nationwide and who require a sophisticated medical treatment for their disorders.
 H.R.Rep. No. 374, 96th Cong., 1st Sess., 82-83 (1979).
 The Senate report states:
 The Committee concurs in the House increases of ... $300,000 to widen diagnostic, health and education services for handicapped children. The current handicapped program budgeted at $292,000 is little more than a consulting service for the Albuquerque, N. Mex., area. Under a cooperative agreement with the Bureau of Indian Affairs, which is to provide facilities, transportation and educational services, the program should expand to one offering short-term residential care and referral services better designed to meet the health needs of Indian Children from all areas of the Nation.
 S.Rep. No. 363, 96th Cong., 2d Sess. 91 (1979).
 
 
 [3]
 The Webster Court, however, held that colorable constitutional claims were reviewable in the absence of clear Congressional intent to the contrary. 486 U.S. at 603, 108 S.Ct. at 2053. See also Community Action of Laramie County, Inc. v. Bowen, 866 F.2d 347, 353 (10th Cir.1989) ("judicial review of colorable constitutional claims remains available unless Congress has made its intent to preclude review crystal clear") [hereinafter CALC ]. We need not address this issue in this case because the Plaintiffs' constitutional claims are not before us given our disposition of the case
 
 
 [4]
 See, e.g., Selman v. United States, 941 F.2d 1060 (10th Cir.1991); American Bank, N.A. v. Clarke, 933 F.2d 899 (10th Cir.1991); Thomas Brooks Chartered v. Burnett, 920 F.2d 634 (10th Cir.1990); Sierra Club v. Yeutter, 911 F.2d 1405 (10th Cir.1990); CALC, 866 F.2d 347; Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir.1988)
 
 
 [5]
 The district court noted that the parties could not agree on the proper source of funding of this project. 746 F.Supp. at 1472 n. 1. We have found it no less difficult to discern the source of funding of the project
 
 
 [6]
 See, e.g., Department of the Interior and Related Agencies Appropriations for 1985: Hearings before a Subcommittee of the Committee on Appropriations, House of Representatives, 98th Cong., 2d Sess., pt. 3, at 486 (narrative submission describing the continuation of Project); Appropriations for 1983, 97th Cong., 2d Sess., pt. 3, at 167 (same); Appropriations for 1982, 97th Cong., 1st Sess., pt. 9, at 70-74 (testimony of Dr. Emery A. Johnson, Director, IHS); Appropriations for 1981, 96th Cong., 2d Sess., pt. 3, at 632 (narrative submission describing continuation of Project). See also supra, note 2 (regarding appropriations for fiscal year 1980)
 
 
 [7]
 In Sierra Club v. Yeutter, 911 F.2d 1405, we held that one of the general purposes of the Wilderness Act of 1964, Pub.L. No. 88-577, 78 Stat. 890 (codified at 16 U.S.C. §§ 1131-36), "to preserve [the] wilderness character" of subject lands, id. § 1133(b), did not provide us with a manageable standard of review. 911 F.2d at 1415-16. The government contends that the general purpose of the Snyder Act likewise does not provide a manageable standard. Sierra Club v. Yeutter, however, is readily distinguishable from this case; it did not involve the federal government's general trust duty to Indians, and it did not involve a specific project "cognized" by Congress in its appropriations process
 
 
 [8]
 The government also contends that Andrus is distinguishable because it dealt only with an exception to the rule making requirements, not with the issue of whether the challenged agency action was a rule. The government is correct in defining the issue of Andrus; the case dealt with the "grants, benefits, or contracts" exception, 5 U.S.C. § 553(a)(2), to APA rulemaking provisions. 667 F.2d at 935. However, the distinction is unavailing, for implicit in the exceptions issue is the existence of a rule