**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORA LUZ SERRATO,
            *Petitioner-Appellant,*

            v.

SCHELIA A. CLARK; HARLEY G.
LAPPIN,

            *Respondents-Appellees.*

No. 06-15167

D.C. No.
CV-05-03416-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
December 6, 2006—Portland, Oregon

Filed May 9, 2007

Before: Jerome Farris, Richard R. Clifton, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

**COUNSEL**

Stephen R. Sady, Federal Public Defender, Portland, Oregon, argued the cause for the appellant.

Andrew Y.S. Cheng, United States Attorney's Office, San Francisco, California, argued the cause for the appellee. Kevin V. Ryan and Joann Swanson, United States Attorney's Office, San Francisco, California, were on the briefs.

**OPINION**

BEA, Circuit Judge:

We are called upon to decide whether the Federal Bureau of Prisons ("BOP") improperly terminated its early-release correctional program for penal inmates known variously as the shock incarceration program, intensive confinement center or ICC program, and boot camp (hereinafter, "boot camp"). Boot camp was established to provide a highly regimented schedule with strict discipline and physical training for inmates. By promoting personal development, self-control, and discipline, the program aimed to reduce recidivism and control prison populations and costs. Upon successful completion of the program, inmates were eligible to have BOP reduce their sentence by up to six months. In 2004, citing budgetary constraints and a study which showed the program

ineffective to reduce recidivism, BOP terminated the program.

Before the boot camp program was terminated, Nora Luz Serrato pleaded guilty to, and was convicted of, possession of methamphetamine with intent to distribute. Serrato wanted to attend boot camp. At sentencing, the judge recommended that Serrato be placed in the program. BOP informed the judge that Serrato's initial sentence was too long for her to be placed directly in the program, so the judge reduced her sentence to make Serrato eligible for direct placement to boot camp. Serrato reported to prison on November 5, 2004, and shortly thereafter requested transfer to boot camp. She was soon informed that the program had been terminated and that no such transfer was possible. Faced with the prospect of losing the six-month sentence reduction boot camp held out, Serrato filed a petition for writ of habeas corpus, claiming BOP's decision to terminate boot camp violated the Administrative Procedure Act ("APA"), the separation of powers, the prohibition on Ex Post Facto punishment, and our holdings on retroactive agency action. The district court denied Serrato's petition. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

### I.  Federal Boot Camp

In 1990, Congress passed 18 U.S.C. § 4046, "Shock incarceration program," which provides:

> (a)   The Bureau of Prisons may place in a shock incarceration program any person who is sentenced to a term of imprisonment of more than 12, but not more than 30, months, if such person consents to that placement.

> (b)   For such initial portion of the term of imprisonment as the Bureau of Prisons may determine, not to

exceed 6 months, an inmate in the shock incarceration program shall be required to —

> (1)    adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training; and

> (2)    participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.

> (c)    An inmate who in the judgment of the Director of the Bureau of Prisons has successfully completed the required period of shock incarceration shall remain in the custody of the Bureau for such period (not to exceed the remainder of the prison term otherwise required by law to be served by that inmate), and under such conditions, as the Bureau deems appropriate.

*See* Crime Control Act of 1990, Pub. L. No. 101-647, § 3001 (1990), 104 Stat. 4789, 4915. Under 28 C.F.R. § 524.32, an inmate who successfully completes the program is eligible to have BOP reduce his or her sentence by up to six months.[1] Regulations provide that designation of inmates to boot camp was to be made "in accordance with sound correctional judgment and the availability of Bureau resources." *Id.* § 524.31. Notably, congressional appropriations for the federal prison

---

[1]According to a 1999 BOP Program Statement, an inmate with a 30-month sentence would serve the sentence in three phases totaling around 24 months: six months in the institutional phase, or actual boot camp program that takes place in prison; four to six months in a community corrections center; and roughly a year of home confinement. U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5390.08 at 9-13, *available at* http://www.bop.gov/policy/progstat/5390_008.pdf (last visited Apr. 13, 2007).

system did not earmark or allocate specific funds for boot camp. *See, e.g.*, Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 53-55.

Boot camp was terminated in late 2004. The decision was communicated in a January 5, 2005, "Message to All Staff" signed by Respondent BOP Director Harley G. Lappin. The memorandum stated that, due to budget pressures and research showing that boot camp did not reduce recidivism, BOP was terminating the program. Director Lappin sent a letter on January 14, 2005, to federal judges, chief United States probation officers, federal public defenders, and United States Attorneys stating the same. Director Lappin also noted in the letter that inmates currently enrolled in the program could complete it and remain eligible for early release benefits, but that no new classes would be offered.

## II.   Serrato's Appeal

Serrato pleaded guilty to a federal count of possession of methamphetamine with intent to distribute, on May 5, 2003, in the United States District Court for the District of Oregon. She did not have a plea agreement. District Judge Anna Brown sentenced Serrato to 37 months imprisonment with five years supervised release on October 17, 2003, and recommended that BOP consider Serrato's eligibility for boot camp.

One month later, on November 17, 2003, BOP Regional Director Robert Haro wrote to Judge Brown "to provide designation information in response to the Court's recent recommendation that Ms. Nora Luz Serrato be placed at a Bureau of Prisons facility where she can participate in the Intensive Confinement Center (ICC) program." The letter stated that although Serrato had been classified as a minimum security level offender, BOP would not directly place Serrato in boot camp because her sentence exceeded the range of 12 to 30 months required for direct placement to boot camp. Rather, Serrato would be designated to the minimum security prison

at the Federal Correctional Institution (FCI) in Dublin, California, and would be reviewed for transfer to boot camp when she was 24 months from release. *See* 28 C.F.R. § 524.31. Judge Brown then resentenced Serrato on September 10, 2004, to 30 months imprisonment with five years supervised release, and again recommended that BOP consider eligibility for boot camp.

BOP records did not accurately reflect Serrato's resentencing, however, and she was designated to report not to a federal prison with a boot camp facility, but to the FCI in Dublin, located in the Northern District of California. Serrato surrendered on November 5, 2004. Upon arrival, Serrato requested to be transferred to boot camp. Case Worker Linda Rodriguez informed Serrato that a Program Review would be scheduled in a few weeks. Rodriguez met with Serrato on November 17, 2004, and informed Serrato she "may be eligible" for boot camp. On November 22, 2004, Rodriguez learned that boot camp was being closed and no referrals were to be made, and she informed Serrato of the same.

On April 7, 2005, Serrato filed a motion to enforce the judgment or to grant 28 U.S.C. § 2255 habeas relief in the District of Oregon, where she had been sentenced. Judge Brown acknowledged that she had resentenced Serrato because of Regional Director Haro's letter: "[T]he Director advised Serrato would not be considered for transfer to boot-camp until she was 24 months from release. On September 10, 2004, therefore, the Court resentenced Serrato to 30 months imprisonment and amended its Judgment accordingly." The court, however, denied Serrato's motion on the grounds that Serrato's sentence was lawful and that claims related to the terms of Serrato's incarceration were properly brought only in the custodial court, the Northern District of California.

On August 23, 2005, Serrato filed a federal habeas petition in the Northern District of California, where she was incarcer-

ated, claiming the government violated the statutory and constitutional provisions at issue in the present appeal. In a memorandum and order dated December 19, 2005, District Judge Charles Breyer held that Serrato had standing and denied the petition on the merits. The court held that BOP's termination of boot camp was within its statutory discretion and not reviewable under the APA, that the termination did not violate the APA's notice and comment procedures, and that the termination violated neither the Constitution's Ex Post Facto Clause, nor the retroactivity doctrine, nor the separation of powers. Judgment was entered the same day, December 19, 2005. Serrato filed this timely appeal January 17, 2006.

In the meantime, BOP had placed Serrato under consideration for a state boot camp program. On or around December 20, 2005, Serrato began a state boot camp program in Wisconsin. At that point, Serrato had already spent over a year in prison.

On January 4, 2006, Serrato filed a Federal Rule of Civil Procedure 60(b) motion in the District of Oregon to reopen her § 2255 motion. The district court reduced Serrato's term of supervised release from five to four years, and otherwise denied the motion. That decision is the subject of *United States v. Serrato*, No. 06-35274, a related appeal decided in a memorandum disposition filed contemporaneously with this opinion.

Serrato completed the state boot camp program and was transferred to a community corrections center in Oregon on or around June 20, 2006. She spent over 19 months in prison. Serrato was released from custody into supervised release July 20, 2006.

## Standard of Review

The court reviews the district court's denial of a petition for writ of habeas corpus *de novo*. *See Leavitt v. Arave*, 383 F.3d

809, 815-16 (9th Cir. 2004) (per curiam). "To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." *Id.* at 815 (citation and internal quotation marks omitted).

## Discussion

### I.  Mootness and Standing

Serrato brought her habeas petition in the Northern District of California, where she was incarcerated at the time. She has since been released from prison and entered supervised release in the District of Oregon. The question thus arises whether the present appeal is moot.

[1] We conclude the appeal is not moot. It seeks relief in the form of reduction of Serrato's supervised release. *See Mujahid v. Daniels*, 413 F.3d 991, 994-95 (9th Cir. 2005) (holding appeal not moot despite intervening release of inmate into supervised release because court could reduce period of supervised release); *see also Gunderson v. Hood*, 268 F.3d 1149, 1153 (9th Cir. 2001). Because 18 U.S.C. § 3583(e)(2)[2] gives the sentencing court the power to reduce a term of supervised release, and because Serrato followed proper habeas procedure in naming as respondent the warden of the prison where she was incarcerated, Serrato's appeal is not moot. *See United States v. Johnson*, 529 U.S. 53, 60 *(2000); Mujahid*, 413 F.3d at 994-95.

---

[2]This section provides:

> The court may, after considering the factors set forth in section 3553(a) . . . extend a term of supervised release if less than the maximum authorized term was previously imposed, and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release . . . .

18 U.S.C. § 3583(e) & (e)(2).

A closer question is whether Serrato has Article III standing to bring the present appeal.

> To satisfy Article III's standing requirements, a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005) (internal quotation marks omitted). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). The district court concluded Serrato had standing to challenge BOP's termination of boot camp because boot camp cancellation created a cognizable and concrete injury in fact that could be redressed by the court. The district court was correct.

**[2]** We first consider whether Serrato suffered an "injury in fact" by BOP's termination of boot camp. Placement in boot camp was a discretionary decision made on an individualized basis by BOP. *See* 18 U.S.C. § 4046(a); 28 C.F.R. § 524.31(b). Under our precedent, however, Serrato suffered an injury in fact because BOP's termination of boot camp denied her the ability to be *considered* for a program that would have allowed her to serve only six months in prison. *Cort v. Crabtree*, 113 F.3d 1081, 1085 (9th Cir. 1997). In *Cort*, three prisoners serving federal sentences for unarmed bank robbery entered into a drug treatment program, the successful completion of which authorized BOP to exercise its discretion to reduce their sentences by up to one year. *Id.* at 1082. After the prisoners had begun the program and been issued determinations of eligibility for early release, BOP revoked their eligibility for early release because BOP had

reclassified unarmed bank robbery as a crime of violence. *Id.* at 1083. The prisoners filed federal habeas corpus petitions claiming BOP's action was impermissibly retroactive as applied to them. The district court denied the petitions on the ground that BOP retained discretion whether to provide the prisoners early release. Reversing, we held that even if BOP retained discretion whether to deny a sentence reduction, the prisoners had a right to have such a determination made: "A prisoner's right *to consideration* for early release is a valuable one that we have not hesitated to protect." *Id.* at 1085.

[3] Similarly, Serrato had a right to be considered for a program that would have reduced her time incarcerated to six months. As the district court noted, the parties do not dispute that Serrato was in fact eligible for boot camp.[3] Although Serrato, unlike the inmates in *Cort*, did not receive official notification of her eligibility for a correctional program, her injury was nevertheless concrete, particularized, and imminent. Judge Brown recommended that Serrato be considered for boot camp. Regional Director Haro informed Judge Brown that Serrato would be eligible for direct placement to boot camp only if her sentence were between 12 and 30 months. Judge Brown "therefore" resentenced Serrato to 30 months imprisonment, tailoring the sentence to the term identified in Regional Director Haro's letter. *See supra* at p. 5374. When boot camp was terminated, Serrato was affected in a personal and individual way because she could no longer be considered for a program that would have allowed her to serve only six months in prison, instead of the 19 months that she served. *See supra* at 5372 n.1. That BOP may have later exercised its discretion to deny Serrato a place at boot camp or to deny her early release, or that Serrato may have failed to complete boot camp once enrolled, are not determinative to our standing

---

[3]Eligibility for boot camp requires, among other things, a finding of physical and mental fitness for the program and a finding that an inmate is appropriate for housing in minimum security. *See* 28 C.F.R. § 524.31(a).

analysis. *Cort*, 113 F.3d at 1085. We conclude that Serrato suffered a cognizable injury for standing purposes when BOP terminated boot camp.

**[4]** The remaining elements of standing are whether the action of which complaint is made can be traced to the claimed injury, and whether the relief sought can redress that injury. *Wilbur*, 423 F.3d at 1107. Serrato's injury is "fairly traceable" to BOP's termination of boot camp, for the reasons stated above. Had BOP not terminated boot camp, Serrato could have been considered for direct placement and, if accepted for enrollment, early release. The sentencing court has the power to redress any injury by reducing Serrato's continuing four-year period of supervised release that began in 2006. *See* 18 U.S.C. § 3583(e)(2); *Johnson*, 529 U.S. at 60; *Mujahid*, 413 F.3d at 994-95. The remaining elements are satisfied; Serrato has standing to bring this challenge to BOP's termination of boot camp.

## II. The APA

### A. *Susceptibility to Judicial Review*

BOP's decision to terminate boot camp is not susceptible to judicial review under the APA because the decision was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[4]

---

[4]"This chapter applies, according to the provisions thereof, except to the extent that—

   (1)   statutes preclude judicial review; or

   (2)   agency action is committed to agency discretion by law."

5 U.S.C. § 701.

When § 701 does not preclude judicial review, § 706 of the APA gives courts the power to "compel agency action unlawfully withheld or unreasonably delayed," and the power to "hold unlawful and set aside agency action, findings, and conclusions." 5 U.S.C. § 706. In this section we undertake a § 701 analysis, not full judicial review under § 706. *See Heckler v. Chaney*, 470 U.S. 821, 829 (1985).

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Indian Health Service ("IHS"), an agency within the Department of Health and Human Services, discontinued a pilot program called the Indian Children's Program that provided services to physically and mentally handicapped Indian children in the Southwest region of the United States. In a memorandum to its offices and referral sources, the agency stated it was terminating the program as part of an effort to provide a program national in scope. *Id.* at 188. Indian children so handicapped, and eligible to receive services through the Program, sued for declaratory and injunctive relief, claiming the agency's decision to terminate the program violated, *inter alia*, the APA. *Id.* at 189. The district court held IHS's decision was subject to judicial review and ordered the program reinstated. *Id.* (citing *Vigil v. Rhoades*, 746 F. Supp. 1471 (D.N.M. 1990)). The Court of Appeals for the Tenth Circuit affirmed. *Id.* (citing *Vigil v. Rhoades*, 953 F.2d 1225 (10th Cir. 1992)). A unanimous Supreme Court reversed, holding the decision to discontinue the program was an allocation of funds from a lump-sum appropriation for permissible statutory objectives and therefore committed to agency discretion and proof from judicial review as to the exercise of that discretion under the APA. *Id.* at 193-94. The Court held "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court continued:

> [A]n agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all.

*Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)) (internal quotation marks omitted).

**[5]** The *Lincoln* Court stated a test that we here find applicable: "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude. '[T]o [that] extent,' the decision to allocate funds 'is committed to agency discretion by law.' " *Id.* (quoting 5 U.S.C. § 701(a)(2)). Accordingly, the Court held in *Lincoln* that the IHS's decision to terminate the Indian Children's Program was committed to agency discretion and therefore not subject to judicial review because "[t]he reallocation of agency resources to assist handicapped Indian children nationwide clearly falls within the Service's statutory mandate to provide health care to Indian people . . . ." *Id.* Here, as in *Lincoln*, the agency program at issue is funded from lump-sum funds in an appropriation from Congress that does not specify how much money should be used for the program.

*Lincoln* also provides a framework for us to apply to determine whether the agency has "allocate[d] funds from a lump-sum appropriation to meet permissible statutory objectives" and has therefore rendered a decision that is not subject to judicial review. *Lincoln*, 508 U.S. at 193. In *Lincoln*, the Supreme Court considered Congress's statutory mandate to the IHS, which included the requirements that it "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians, for the relief of distress and conservation of health," 508 U.S. at 185 (quoting 25 U.S.C. § 13) (internal quotation marks omitted); and make "expenditures for, *inter alia*, Indian mental-health care, and specifically for therapeutic and residential treatment centers," *id.* (quoting 25 U.S.C. § 1621(a)(4)(D)) (internal quotation marks omitted). The Court held IHS's "reallocation of agency resources to assist handicapped Indian children nationwide clearly falls within the Service's statutory mandate to provide health care to Indian people. . . . The decision

to terminate the Program was committed to the Service's discretion." *Id.*

**[6]** Similarly, following the approach in *Lincoln*, we find BOP discontinued boot camp to meet permissible statutory objectives, and that its decision is therefore unreviewable. Congress's statutory mandate to BOP includes the following:

> The Bureau of Prisons, under the direction of the Attorney General, shall —
>
> > (1)   have charge of the management and regulation of all Federal penal and correctional institutions;
> >
> > (2)   provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
> >
> > (3)   provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

18 U.S.C. § 4042(a). Congress provided authority for BOP to operate boot camp in 18 U.S.C. § 4046, but in using the word "may," did not mandate that the program operate continuously: "The Bureau of Prisons *may* place in a shock incarceration program any person who is sentenced to a term of imprisonment of more than 12, but not more than 30, months, if such person consents to that placement." 18 U.S.C. § 4046(a) (emphasis added).[5]

---

[5]When Congress enacted § 4046, it similarly authorized future appropriations for the program using permissive language: "There are authorized to be appropriated for fiscal year 1990 and each fiscal year thereafter such

**[7]** Director Lappin's January 5, 2005, Message to Staff noted that boot camp was discontinued as a cost-cutting measure, which was expected to "result in more effective and efficient operations." Director Lappin's message also identifies three "key principles" guiding BOP's round of cost-cutting measures: bringing in new prison beds to reduce crowding, increasing direct staff contact with inmates, and minimizing the impact on staff who are displaced by cost-cutting measures. Director Lappin's later letter to judges, probation officers, federal public defenders, and U.S. Attorneys echoes his January 5 letter. Increasing the efficiency of BOP operations and advancing the principles articulated by Director Lappin "clearly fall[ ] within the [agency's] statutory mandate." *Lincoln*, 508 U.S. at 193. Reducing crowding, increasing staff contact with inmates, and trying to retain valuable staff members help further BOP's statutorily mandated mission. *See* 18 U.S.C. § 4042(a). As an allocation of lump-sum appropriations for statutorily permissible uses, BOP's decision to terminate boot camp is not susceptible to judicial review under the APA.

*B. Notice and Comment*

**[8]** An agency's obligation to comply with the APA's notice and comment provisions is an administrative requirement that must be fulfilled, notwithstanding whether an agency's action is susceptible to judicial review. 5 U.S.C. § 553; *Lincoln*, 508 U.S. at 195-96. Here, BOP was not required to use notice and comment procedures in terminating boot camp because its decision was a "general statement[ ] of policy" exempt from notice and comment. 5 U.S.C. § 553(b)(A).

---

sums as *may be necessary* to carry out the shock incarceration program established under the amendments made by this Act." Crime Control Act of 1990, Pub. L. No. 101-647, § 3002 (1990), 104 Stat. 4789, 4915 (emphasis added).

**[9]** Again, *Lincoln* is on point. In *Lincoln*, the Supreme Court held that the IHS's discontinuance of the Indian Children's Program was a general statement of policy because it was a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197 (citation and internal quotation marks omitted). The Court further held: "Whatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." *Id.* For reasons discussed above, our case similarly involves a discretionary allocation of unrestricted funds from a lump-sum appropriation. Because *Lincoln* controls, BOP's decision is a general statement of policy; notice and comment simply was not required.[6]

## III. Sentencing Statutes, Sentencing Guidelines, and the Separation of Powers

Serrato argues BOP's termination of boot camp violates federal sentencing statutes and the United States Sentencing Guidelines ("Guidelines"), which "assume the existence of the program." Serrato's theory is that by terminating boot camp, BOP impermissibly intruded on other branches of government, namely, on Congress's prerogative to enact a boot camp program, on the United States Sentencing Commission's ability to promulgate the Guidelines, and on the judi-

---

[6]*Morton v. Ruiz*, 415 U.S. 199 (1974) does not control the result here. In *Morton*, the Bureau of Indian Affairs discontinued benefits to Indians living near reservations without formally publishing eligibility requirements, as provided for in a Bureau manual. Off-reservation Indians sued under, *inter alia*, federal Indian law statutes. The district court dismissed the complaint, and we reversed. The Supreme Court affirmed and remanded. It held that the agency's action violated both agency procedures and the government's duty to deal fairly with Indians, and therefore the action would not be granted deference. *Morton* is not on point because APA notice and comment requirements were not at issue in *Morton*, which dealt with the enforcement of the agency's own regulations.

ciary's ability to recommend that prisoners be designated to boot camp.

BOP has a responsibility to inform the Sentencing Commission of suggested comments and changes to the Guidelines. 28 U.S.C. § 994(o) provides that BOP "shall submit to the [U.S. Sentencing] Commission any observations, comments, or questions pertinent to the work of the Commission whenever they believe such communication would be useful." It further provides that BOP shall submit an annual report "suggesting changes in the guidelines that appear to be warranted." *Id.* 28 U.S.C. § 994(p) provides for the Commission, in turn, to "submit to Congress amendments to the guidelines and modifications to previously submitted amendments."

**[10]** Boot camp is a federal sentencing option under the Guidelines. Chapter 5, Part F, of the United States Sentencing Commission's *Guidelines Manual* is entitled "Sentencing Options" and includes U.S.S.G. § 5F1.7, p.s., "Shock Incarceration Program (Policy Statement)." This section provides that federal sentencing courts "may recommend that a defendant who meets the criteria set forth in 18 U.S.C. § 4046 participate in a shock incarceration program." *Id.*

**[11]** BOP's termination of boot camp has not, however, impermissibly altered or amended a Sentencing Guideline without proper approval from the Commission or Congress. Both 18 U.S.C. § 4046 and U.S.S.G. § 5F1.7 remain on the books and have practical effect. Section 4046 continues to authorize BOP to establish a boot camp program. Section 5F1.7 continues to authorize judges to recommend prisoners to such program, if and when it may be renewed.[7] BOP's discretionary decision how to allocate its lump sum appropria-

---

[7]Even if BOP does not reestablish boot camp, BOP may take other actions based on a sentencing judge's recommendation under § 5F1.7 that a prisoner "participate in a shock incarceration program." For example, Serrato attended a state boot camp in Wisconsin.

tion does not impermissibly impinge on Congress, the Sentencing Commission, or the judiciary.

## IV.    The Ex Post Facto Clause and Retroactivity Doctrine

**[12]** Finally, Serrato argues that BOP's cancellation of boot camp violated the Ex Post Facto Clause and was impermissibly retroactive. Article I, § 9, cl. 3, of the Constitution provides: "No Bill of Attainder or ex post facto Law shall be passed." The Supreme Court has stated: "To fall within the ex post facto prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citations omitted) (holding that state statute cancelling early release credits, and resulting in the rearrest and reincarceration of a former prisoner, violated the Ex Post Facto Clause). The *Lynce* opinion relied on *Weaver v. Graham*, 450 U.S. 24 (1981), which held that when a Florida statute reducing the amount of good credit time available to a prisoner was applied to a prisoner whose crime occurred before the statute's enactment, the Ex Post Facto Clause was violated:

> As we recognized in *Weaver*, retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the Ex Post Facto Clause because such credits are "one determinant of petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed."

*Lynce*, 519 U.S. at 445-46 (quoting *Weaver*, 450 U.S. at 32).

**[13]** Assuming that BOP regulations terminating boot camp constitute a "law," that law does not result in an Ex Post Facto Clause violation. *Lynce* and *Weaver* do not control this case.

In those cases, prisoners with vested good time credits had those vested benefits revoked by statute. Here, by contrast, Serrato had only a recommendation by a judge that her eligibility for a discretionary program be evaluated. Serrato had not earned any early release privileges when informed that the program she wanted to attend had been terminated; thus, this case is unlike *Lynce* and *Weaver*. BOP regulations terminating boot camp did not alter the definition of criminal conduct or increase Serrato's punishment for the crime within the meaning of the Ex Post Facto Clause.[8]

[14] Quoting this court, Serrato argues that BOP's termination of boot camp was impermissibly retroactive agency action.

> [T]his is not a game of Lucy and the football from the world of Charles Schulz. Rather, it is a serious administrative agency program to be administered in a consistent, coherent matter. An agency cannot provide participants with a determination of eligibility based on the purported examination of objective criteria, then subsequently deny them eligibility by exercise of whim. If we expect inmates to observe the rule of law, we must adhere to it ourselves.

*Bowen v. Hood*, 202 F.3d 1211, 1222 (9th Cir. 2000). As this language shows, however, in *Bowen*—and in *Cort*, discussed *supra* Part I—BOP attempted to revoke prior determinations of eligibility for early release. Unlike the inmates in *Bowen* and *Cort*, Serrato was never officially notified of eligibility for boot camp. There is thus no basis for concluding that BOP

---

[8]In *Castellini v. Lappin*, 365 F. Supp. 2d 197, 205 (D. Mass. 2005), the district court concluded that, under *Lynce* and *Weaver*, an inmate was likely to prevail on a claim that boot camp termination violated the Ex Post Facto Clause. However, the court docket shows the case was later dismissed. Of course, that decision would not bind our court even had it not been dismissed.

has flouted the "rule of law" within the meaning of *Bowen*. Regional Director Haro informed Judge Brown that Serrato "will be reviewed for [boot camp] when she is 24 months from her release." Judge Brown reduced Serrato's sentence to 30 months so that she could instead be placed directly into boot camp, but this does not change the fact—determinative to our retroactivity analysis—that BOP did not inform Serrato of her eligibility for boot camp. The boot camp program was terminated before any such determination was made by the competent authorities. Therefore, Serrato's retroactivity challenge fails.

## Conclusion

Although this case is not moot and Serrato has standing to challenge BOP's termination of boot camp, her substantive challenges fail. BOP's decision, which was prompted by what it saw as budget constraints and better uses of its lump-sum appropriation, was committed to its discretion by law, and did not require notice and comment. BOP's act did not violate sentencing statutes, the Guidelines, or the separation of powers. Serrato has suffered no harm cognizable under the Ex Post Facto Clause or our retroactivity doctrine.

**AFFIRMED.**